IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

DONALD H. PUTNAM,

    Plaintiff,

  v.

PUTNAM LOVELL GROUP NBF SECURITIES, INC., a Delaware corporation; NATIONAL BANK OF CANADA, a Canadian chartered bank; NATIONAL BANK FINANCIAL, INC., a Quebec corporation; and DOES 1-20, inclusive,

    Defendants.

                                      /

No. C 05-1330 CW

ORDER DENYING DEFENDANTS' MOTION TO DISMISS

Defendants National Bank of Canada (NBC) and National Bank Financial, Inc., (NBF) (collectively, Defendants[1]) move pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b) to dismiss Plaintiff Donald Putnam's First Amended Complaint (FAC).  Plaintiff opposes this motion.

The matter was taken under submission on the papers.  Having considered all of the papers filed by the parties, the Court DENIES the motion to dismiss, for the reasons explained below.

---

[1] In this Order, all references to "Defendants" connote the moving Defendants only.  Defendant Putnam Lovell NBF Securities, Inc., does not join in the motion to dismiss.

BACKGROUND

Unless otherwise noted, the facts are drawn from Plaintiff's FAC and the July 23, 2003 memo attached as an exhibit to the original complaint, and are taken as true. Plaintiff's allegations are discussed in somewhat greater detail in the Court's October 5, 2005 Order Granting in Part and Denying in Part Defendants' Motion to Dismiss (the October 5, 2005 Order).

Plaintiff is a founder and ex-CEO of the former Putnam Lovell Group (Putnam Lovell). In April, 2002, Putnam Lovell was acquired by NBF, a Canadian corporation and subsidiary of NBC, a Canadian bank. The surviving entity was named PLNBF. Plaintiff retained managerial control of certain business, known collectively as the Global FIG Business.

The merger was governed by an April 13, 2002 Agreement and Plan of Merger.[2] Its choice-of-law section provides that it shall be "construed in accordance with and governed by the law of the State of New York (except insofar as mandatory provisions of Delaware Law are applicable), without regard to the conflicts of law principles thereof." Merger Agreement (MA) § 11.8.

The Merger Agreement divided the Putnam Lovell shareholders into two groups. One group, termed the FIG Shareholders, was to receive shares in NBC, which were deposited into escrow for release in installments. Plaintiff was the FIG Shareholder who held the majority of the escrow and the Managing Member of a limited liability corporation governing the interests of the FIG

---

[2] The Court has taken judicial notice of the entire Merger Agreement; see October 5, 2005 Order at 2 n.1.

2

1  Shareholders.  The last installment, termed the Global FIG
2  Installment, constituted a substantial portion of the consideration
3  for the merger and was scheduled to be released from escrow on
4  December 31, 2004.  The release and size of the Global Release
5  Installment depended in part upon the amount of revenue generated
6  by the FIG Business during this "Earn Out" period.

7  Plaintiff retained responsibility for hiring and firing FIG
8  Business personnel.  After the merger was completed, NBF executives
9  negotiated with Plaintiff to terminate twelve PLNBF employees.
10 Because the proposed personnel reduction would affect the ability
11 of the FIG Business to meet the agreed-upon revenue targets, NBF
12 and NBC agreed, as set forth in the July 23, 2003 memo, to revise
13 the Earn Out formula.  The memo, authored by NBF executive Kym
14 Anthony and sent to FIG Shareholders, stated in full,

> I understand that Don [Plaintiff] and Ian [Brimecome, another PLNBF manager] have had discussions with you regarding contemplated changes to the arrangements regarding the contingent Earn Out arrangements, i.e., Global FIG Installment, agreed to in the context of the purchase by NBF of Putnam Lovell.  I understand that your discussions have taken place in the context of focusing on the role of the FIG leadership team relative to profitability, expense control and retention issues regarding Global FIG as opposed to just revenues.
> I wish to confirm that these Earn Out arrangements regarding each of you, other than Don and Ian, will be modified so that the test for your being able to earn your share of the Global FIG Installment will change from a revenue and time contingency test to a time contingency test only, (i.e., NB will waive the revenue hurdle test, and the condition for you being entitled to your share of the Installment will only be a function of your continued employment through to the end of the Earn Out Period, i.e. September 30, 2004).  For Don's and Ian's share, the same time test will apply, but will also include certain other tests relating to the performance of the Global FIG business.  All other terms and conditions regarding the Earn Out will remain the same, and will continue to apply.  The details of these arrangements and the related paperwork will follow in the next

3

> few weeks.
>
> I thank you for your efforts to date, and know that you will all continue to contribute to the success of Global FIG and to the firm.

In or around March, 2004, Plaintiff and Brimecome reached an oral agreement with NBC and NBF regarding the other tests relating to the performance of the Global FIG business. FAC ¶ 15. The oral agreement was subsequently confirmed in numerous emails as well as draft agreements, and it "replaced and superceded in their entirety the provisions of the Merger Agreement relating to the Global FIG Installment." Id. According to this alleged oral agreement, Plaintiff and Brimecome would earn forty percent of their share of the Global FIG Installment if they remained as PLNBF employees through September 30, 2004; twenty-five percent of their share based on successful cost-cutting measures (i.e., termination of PLNBF employees); and the remaining thirty-five percent "dependent upon the FIG Business revenues achieving revised targets, the details of which the parties agreed to negotiate in good faith." Id.

Documents memorializing this oral agreement were drafted, but were "not formally executed" in order to avoid increased tax risks for employee shareholders. Id. ¶ 16. Plaintiff was urged to rely on the July 23, 2003 memo and related promises "instead of pressing for formal documentation." Id. Acting in reliance on the alleged oral agreement, Plaintiff terminated twelve PLNBF employees, as well as other revenue-producing personnel. In December, 2004, Plaintiff also terminated Brimecome, likewise in reliance on promises made regarding adjustments to the Earn Out formula.

4

In November and December, 2004, NBC and NBF told Plaintiff that they never agreed to "replace and supercede in their entirety the provisions of the Merger Agreement relating to the Global FIG Installment."[3]  Id. ¶ 19.  NBC and NBF failed to release any part of the Global FIG Installment to Plaintiff or other FIG Shareholders.  When Plaintiff accused NBC and NBF of reneging on their promises, Defendants terminated Plaintiff without cause and with no prior notice.

Plaintiff was denied severance payments upon termination, thereby depriving him of "compensation rights under his implied contract with PLNBF, NBC and NBF," in that those entities had assumed Putnam Lovell's long-standing policy and practice of providing "substantial severance and benefit payments to executives and employees upon their retirement."  Id. ¶ 21.  NBC and NBF had similar long-standing policies regarding severance payments, and NBF's Chief Human Resources Executive informed Plaintiff in January, 2005, that Plaintiff would be entitled to a benefits package worth approximately $2.2 million if he were terminated.  Plaintiff was then told that he could obtain these benefits only if he agreed to forego payment of the Global FIG Installment.

In his original complaint, Plaintiff brought seven claims, the first five based on NBC and NBF's alleged failure to release the Global FIG Installment, and the last two, against NBC, NBF and PLNBF, based on their alleged failure to provide Plaintiff with a

---

[3]In his original complaint, Plaintiff stated that NBC and NBF told him only that they had never agreed "to modify the earn out formula associated with" the Global FIG Installment.  Complaint ¶ 19.

5

severance and benefits package.  In its October 5, 2005 Order, the Court denied Defendants' motion to dismiss Plaintiff's first claim for breach of an oral contract as well as his sixth and seventh employment-related claims for breach of an implied contract and breach of an implied covenant of good faith and fair dealing.  The Court dismissed with leave to amend Plaintiff's second, third, fourth and fifth claims for breach of an implied contract, promissory estoppel, fraud and breach of fiduciary duty, relating to the Global FIG Installment.

In his FAC, Plaintiff brings six claims.  The first four are again based on NBC and NBF's alleged failure to release the Global FIG Installment: (1) breach of an express oral contract, against NBC and NBF; (2) breach of an implied contract, against NBC and NBF; (3) promissory estoppel, against NBC and NBF; and (4) fraud and deceit, against NBC and NBF.  The last two claims for (5) breach of an implied contract and (6) breach of the implied covenant of good faith and fair dealing are brought against NBC, NBF and PLNBF.

Defendants now argue that Plaintiff has failed to cure the defects identified in his original complaint, and move to dismiss Plaintiff's second, third and fourth claims in their entirety. Defendants also move for the second time to dismiss the fifth and sixth employment-related claims against NBC and NBF.  The standards used to evaluate Defendants' motion to dismiss were set forth in the Court's prior order.

6

DISCUSSION

I.  Fraud and Deceit Claim

Defendants move to dismiss Plaintiff's claim for fraud and deceit on the grounds that Plaintiff has failed to amend his complaint to show that New York law is not applicable and that he has failed to state a claim for fraud under New York law. Plaintiff opposes the motion, and further argues that even if the Merger Agreement's choice-of-law provision was not superceded, California law should apply.

   A.  Survival of Choice-of-Law Provision

In its prior order, the Court found that the validity of Plaintiff's fraud claim depended in part on whether New York or California law applied to it.  See October 5, 2005 Order at 15-17. The Court also found that the Merger Agreement's choice-of-law provision selecting New York law would apply to the alleged oral agreement between Plaintiff and Defendants, unless Plaintiff could truthfully allege that the later oral contract "did indeed entirely supercede all portions of the Merger Agreement which pertain to Plaintiff's share of the Global FIG Installment, including its choice-of-law provision."  Id. at 9.

Plaintiff now alleges in the FAC that the oral agreement "replaced and superceded in their entirety the provisions of the Merger Agreement relating to the Global FIG Installment."  FAC ¶ 15.  The parties debate whether the phrasing of the FAC indeed states that the choice-of-law provision was superceded, or whether it merely alleges that the oral agreement superceded the portion of the Merger Agreement which deals directly with the Global FIG

7

1  Installment, i.e. Article 2.  Although the language of the FAC is
2  fairly susceptible to both interpretations, it is clear from the
3  briefing that Plaintiff intends to allege that the choice-of-law
4  provision was superceded.  Whether the alleged oral agreement did,
5  in fact, supercede the New York choice-of-law provision is a
6  question of fact that cannot be decided on a motion to dismiss.
7      Defendants' reliance on the Escrow and LLC Agreements to prove
8  their point illustrates why this is so.  Defendants argue that
9  Plaintiff's current position is untenable because, if the
10 "provisions of the Merger Agreement relating to the Global FIG
11 Installment" are interpreted to include the choice-of-law
12 provision, then they must also include those portions of the Merger
13 Agreement that provided for the delivery of shares to the FIG
14 shareholders, because it is the Merger Agreement that incorporates
15 the agreements which govern those issues, i.e. the Escrow Agreement
16 and the LLC Agreement.  However, the Court cannot conclude that
17 Plaintiff's allegations are indeed untenable without knowing more
18 about the alleged oral contract than is shown by the pleadings.
19 For instance, if the oral contract _also_ incorporated the Escrow and
20 LLC Agreements, then Plaintiff's allegations would be reasonable.
21 Therefore, the Court again concludes that the time is not yet ripe
22 for a final decision as to whether New York or California law
23 applies to Plaintiff's fraud claim.
24     B.   Scope of Choice-of-Law Provision Under New York Law
25     Plaintiff argues that even if the Merger Agreement's choice-
26 of-law provision was not superceded by the alleged oral agreement,
27 under New York law the provision would not cover his claim of
28

fraud.

As stated in the October 5, 2005 Order, in assessing the Merger Agreement, the Court applies the "choice of law rules of California, the forum state." <u>Gen. Signal Corp. v. MCI Telecomm. Corp.</u>, 66 F.3d 1500, 1505 (9th Cir. 1995) (citing <u>Day & Zimmerman, Inc., v. Challoner</u>, 423 U.S. 3, 4 (1975)).  California law construes contractual choice-of-law provisions broadly, reflecting "a strong policy favoring enforcement" of such agreements. <u>Nedlloyd Lines B.V. v. Superior Court</u>, 3 Cal. 4th 459, 465 (1992). The exceptions to application of choice-of-law provisions are if "(1) the chosen state has no substantial relationship to the parties or transaction, or (2) such application would run contrary to a California public policy or evade a California statute."[4] <u>Gen. Signal Corp.</u>, 66 F.3d at 1506.  Therefore, if the alleged oral agreement modified the Merger Agreement but did not supercede the Merger Agreement's choice-of-law provision, then New York law would apply to the alleged oral agreement.

However, as Plaintiff notes, application of <u>Nedlloyd</u> also means that if the agreement is ambiguous in its scope, then the law of the forum identified in the choice-of-law provision, New York law, is used to determine whether that choice extends to the tort claim at issue.  3 Cal. 4th at 469, n.7.  Plaintiff cites a series of New York cases for the proposition that New York law does not

---

[4] Plaintiff additionally argues that California law should apply because New York law has no substantial relationship to the transaction. Defendants state that the drafters of the Merger Agreement resided in New York. The Court finds that adjudication of New York's relationship to the transaction would be premature at this time.

9

1 construe contractual choice-of-law clauses broadly to encompass
2 tort claims.  See, e.g., Knierieman v. Bache Halsey Shields Inc.,
3 427 N.Y.S. 2d 10, 12-13 (App. Div. 1980) (holding that contract's
4 choice of law provision did not apply to claims sounding in tort),
5 overruled on other grounds, Rescildo v. R.H. Macy's, 594 N.Y.S.2d
6 139 (App. Div. 1993).  Here, however, as discussed in Section I(C)
7 below, Plaintiff's fraud claim may be brought under New York law as
8 an alternative to his contract claims.  None of the cases cited by
9 Plaintiff suggest that New York law would so narrowly construe a
10 choice-of-law provision that it would exclude from coverage a tort
11 claim that could be plead as an alternative to a breach of contract
12 claim.  To the contrary, the rationale behind these cases is that a
13 forum selection clause should not cover a tort cause of action
14 based on "activities, which were unrelated to [the defendant's]
15 duties" under the contract.  Twinlab Corp. v. Paulson, 724 N.Y.S.2d
16 496, 497 (App. Div. 2001).

17     Therefore, the Court concludes that if the Merger Agreement's
18 choice of law provision is not superceded, its choice of New York
19 law would apply to Plaintiff's claim for fraud.

20     C.   Fraud Claim Under New York Law

21     As explained in the October 5, 2005 Order, a misrepresentation
22 of intent to perform under a contract cannot support a fraud claim
23 under New York Law.  Manning v. Utils. Mut. Ins. Co., 254 F.3d 387,
24 401 (2nd Cir. 2001) (citing Bridgestone/Firestone, Inc., v.
25 Recovery Credit Servs., Inc., 98 F.3d 13, 19-20 (2nd Cir. 1996)).
26 In order to maintain a tort claim for fraud based on an alleged
27 breach of contract, a plaintiff must "either (i) demonstrate a

10

legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." Bridgestone/Firestone at 20 (internal citations omitted).

In the October 5, 2005 Order, the Court found that the allegedly fraudulent acts committed by Defendants (e.g., acquiring Putnam Lovell, forcing Plaintiff to terminate his employees and failing to release the Global FIG Installment) all involved either Plaintiff's performance in reliance upon, or Defendants' non-performance of, the alleged oral contract. The Court concluded that Plaintiff had not sufficiently alleged the type of misrepresentations or special damages that would allow him to recover in tort under Bridgestone/Firestone. The Court granted Plaintiff leave to amend "if he can allege, truthfully and without contradicting the original complaint, conduct that constitutes breach of a duty independent of the contract or special damages." October 5, 2005 Order at 17.

Plaintiff now argues that he has stated a claim for fraud even if New York law applies because (1) he has alleged misrepresentations that are collateral or extraneous to the contract, and (2) his fraud claim is plead as an alternative to his contract claim. Because the Court finds that Plaintiff may proceed with his fraud claim as an alternative to his breach of contract claims, it need not reach the question of whether he has alleged misrepresentations that are sufficiently collateral or extraneous.

11

A plaintiff may not convert a breach of contract claim into a fraud claim under New York's Bridgestone/Firestone rule because otherwise he or she could "plead two independent claims, and recover twice, for the same conduct." Blank v. Baronowski, 959 F. Supp. 172, 180 (S.D. N.Y. 1997). In Champion Motor Group v. Visone Corvette, 992 F. Supp. 203 (E.D. N.Y. 1998), the court found that a fraud claim stated a "valid alternative to the breach of contract claim," where one fair reading of the complaint was that no contract existed, and thus the defendant's statements that it would enter into a contract were "extraneous" to the contract claim. As Defendants note, Plaintiff's fraud claim here is not explicitly plead in the alternative. However, Defendants identify no reason why Plaintiff may not bring his fraud claim in the alternative, in the event no contract is found to exist.

In sum, Plaintiff may proceed with his fraud claim in the event California law applies. If New York law applies, Plaintiff may recover on his claim for fraud only as an alternative to his breach of contract claims.

II. Breach of Implied Contract and Promissory Estoppel Claims

Defendants move to dismiss Plaintiff's claims for breach of an implied contract and for promissory estoppel, on the grounds that these claims are precluded by the express Merger Agreement.

In the October 5, 2005 Order, the Court found that the express terms of the Merger Agreement precluded these claims. Plaintiff was granted leave to amend his allegations, if he could do so truthfully and without contradicting his original complaint, to allege rescission of the portions of the Merger Agreement embracing

12

the same subject matter as the alleged implied contract or alleged promise.

The FAC now states explicitly that the claims for breach of an implied contract and for promissory estoppel are plead as alternatives to each other and to the claim for breach of an express contract. FAC ¶¶ 33, 40. The FAC does not allege that the Merger Agreement was rescinded, but instead alleges that NBC and NBF either "agreed" or "promised" to "replace and supercede in their entirety the provisions of the Merger Agreement relating to the Global FIG Installment." Id. ¶¶ 35, 41.

Defendants argue that these new allegations contradict the terms of the July 23, 2003 memo, which stated that "all other terms and conditions regarding the Earn Out will remain the same, and will continue to apply." However, Plaintiff could prove, consistent with this memo and the other allegations in his complaint, that Defendants subsequently either agreed or promised to replace and supercede the portions of the Merger Agreement relating to the Global FIG Installment. Although Defendants complain that Plaintiff has not plead additional facts sufficient to support the allegations in his alternative claims, such facts are not necessary at this stage. For the reasons described in Section I(A) above, the Court finds that Plaintiff's revisions have cured the deficiencies identified in his initial complaint.

Defendants also argue, relying on Mike Nelson Co. v. Hathaway, No. F 05-0208 (AWAI), 2005 WL 2179310, *4 (E.D. Cal. Sept. 8, 2005), that Plaintiff may not plead in the alternative causes of action which preclude one another. As the district court there

13

stated, however, plaintiffs are allowed to plead mutually exclusive claims in the alternative, but are not allowed to "recover on inconsistent theories." Mike Nelson, *4 (quoting Brookhaven Landscape & Grading Co., Inc., v. J.F., 676 F.2d 516, 523 (11th Cir. 1982)).  As Federal Rule of Civil Procedure 8(e)(2) provides,

> A party may set forth two or more statements of a claim or defense alternately or hypothetically, either in one count or defense or in separate counts or defenses. . . . A party may also state as many separate claims or defenses as the party has regardless of consistency and whether based on legal, equitable, or maritime grounds.

Plaintiff's current pleading is allowable under Rule 8(e)(2).

For these reasons, the Court denies Defendants' motion to dismiss Plaintiff's claims for breach of an implied contract or for promissory estoppel with respect to the Global FIG Installment.

III. Breach of Implied Contract and of Implied Covenant of Good Faith and Fair Dealing

Defendants move to dismiss Plaintiff's claims against NBC and NBF for breach of an implied contract to pay severance benefits and breach of the implied covenant of good faith and fair dealing.

In the October 5, 2005 Order, the Court denied Defendants' motion to dismiss these claims, in part because Defendants did not introduce any authority on the question of whether an entity that is not an employer, but has promised a severance package, may be held liable for failure to pay those benefits.

Defendants now move to dismiss these claims on the grounds that Plaintiff has not sufficiently alleged that NBC or NBF ever promised him any severance benefits.  However, the FAC alleges that Plaintiff discussed the former Putnam Lovell's policy and practice of providing "substantial severance and benefit payments to

14

executives and employees upon their termination" with representatives of NBC and NBF, and that he was assured by them that "NBC/NBF and PLNBF intended to (and subsequently did) continue them in the future." No more detailed allegations regarding the alleged promise to pay a severance package are needed in order to plead the employment claims adequately. Therefore, the Court denies Defendants' motion to dismiss these claims.

## CONCLUSION

For the foregoing reasons, the Court DENIES Defendants' motion to dismiss certain claims in the FAC (Docket No. 46).

IT IS SO ORDERED.

Dated: 6/30/06

_____
CLAUDIA WILKEN
United States District Judge

United States District Court
For the Northern District of California

15